Timothy C. **REEVES**, Appellant
(Plaintiff Below),

v.

**BOYD & SONS, INC.**, Appellee
(Defendant Below).

No. 49A04–9408–CV–326.

Court of Appeals of Indiana.

Aug. 22, 1995.

Transfer Denied Jan. 31, 1996.

W.F. Conour, Rex E. Baker, Daniel J. Mages, Conour Doehrman, Indianapolis, for appellant.

W. Brent Threlkeld, Robert A. Durham, Rocap Witchger & Threlkeld, Indianapolis, Rebecca J. Maas, Eric Brodt & Associates, Indianapolis, for appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Timothy C. Reeves appeals the jury verdict finding him 100% at fault for his collision with a Boyd & Sons, Inc. tractor-trailer and holding him liable for damages to it. We affirm.

### ISSUES

1. Whether admission of medical records disclosing results of Reeves' blood alcohol test was reversible error.

2. Whether allowing inquiry into Reeves' previous driving under the influence conviction was reversible error.

3. Whether failure to submit to the jury an instruction tendered by Reeves was reversible error.

4. Whether the court's refusal to allow Reeves to depose an individual originally listed as a witness for the defense, but later removed from that list and who did not testify, was reversible error.

### FACTS

On October 23, 1990, Timothy C. Reeves left work at his construction job site and joined some fellow workers at a nearby bar and grill between 4:00 and 4:30 p.m. During his approximately one hour stay, he consumed two long-neck bottles of beer. Reeves and some of his companions decided to continue their evening at Dancers, a strip club on West Washington Street in Indianapolis.

Reeves left the bar, stopped at a fast food restaurant for a burger, fries and cola, and then arrived at Dancers sometime before 7:00. Reeves ordered and drank a glass of

beer. He then ordered a pitcher of beer. Reeves' expected companions never arrived.

Departing Dancers after 1:00 a.m., Reeves traveled east on Washington Street. As he drove, Reeves saw a gas station and checked his fuel gauge to see whether he needed gas. Because his dashboard light was not working he could not read the gauge. He turned on his dome light. After he turned the dome light off, he saw a semi-tractor-trailer in front of him. The tractor-trailer was angled across Washington Street in the process of backing into a drive across from 84 Lumber Company, which was the destination of the truck's load of lumber. Reeves tried to apply his brakes but missed. Reeves drove into the side of the tractor-trailer.

The 1989 Peterbilt tractor had its headlights on; flashers were activated on the cab and along the side of the 1990 Wilson trailer. On the side of the tractor's "sleeper" were four lights with two bulbs each; under the door of the cab were another four lights with two bulbs each; and there were five lights on top of the cab. The trailer itself had a "light in the center ... which would flash on each side, and then a light at the very front of the trailer and the very rear and then two (2) other ones centered in between the center ones and the far end ones." (R. 707). There were also reflectors on the side of the trailer, and a "pole light" was attached to the side of the front bumper.

A driver traveling behind Reeves on Washington Street realized there was "something blocking the road" and saw the silhouette of the tractor-trailer from a distance of slightly less than a quarter mile away. The driver estimated his distance behind Reeves at "between an eighth and a quarter of a mile." (R. 951).

After the collision, reported as occurring at 1:38 a.m. on October 24th, sheriff's department and ambulance personnel arrived on the scene. Several of these people testified that Reeves was intoxicated. Reeves was transported to Methodist Hospital, arriving at 2:40 a.m., and was treated by trauma service resident Dr. Douglas Carr. In the course of Dr. Carr's evaluation of Reeves' condition for the purpose of treating him, blood tests were performed. Reeves' blood was drawn at 3:00 a.m. and tested at 3:13 a.m. According to one of the tests conducted, Reeves' blood alcohol content level was .179.

On June 23, 1992, Reeves brought a personal injury lawsuit against Boyd & Sons, Inc. (hereafter, "Boyd"), the owner of the tractor-trailer. Boyd counterclaimed[1] for damages to its tractor-trailer. The case was tried to a jury over a period of four days. The jury returned a verdict in favor of Boyd on both Reeves' complaint and Boyd's counterclaim, finding 100% of fault in the incident attributable to Reeves and Reeves liable to Boyd for the damage therefrom.

## DISCUSSION AND DECISION

### 1. Blood Alcohol Test Result

Reeves claims that "the trial court committed reversible error by admitting medical records containing a blood alcohol test result, allegedly obtained utilizing a sample of blood from the plaintiff Timothy C. Reeves, without a proper foundation showing the chain of custody of the sample." Reeves' Brief at 10.

The admission of evidence "is a determination entrusted to the discretion of the trial court." *Eversole v. Consolidated Rail Corp.* (1990), Ind.App., 551 N.E.2d 846, 854, *reh'g denied, trans. denied* (citation omitted). On appellate review, we consider whether the trial court has abused its discretion in admitting evidence, i.e., whether "the court's action is clearly erroneous and against the logic and effect of the facts and circumstances before it or the reasonable inferences to be drawn therefrom." *Id.* (citation omitted). To constitute reversible error, the evidence erroneously admitted cannot be "merely cumulative." *Jordan v. Talaga* (1989), Ind.App. 532 N.E.2d 1174, 1191, *reh'g denied, trans. denied.*[2]

---

1. Reeves does not mention the counterclaim, nor is it part of the record submitted by Reeves. According to the court docket, a counterclaim was filed April 30, 1993. (R. 5). Boyd's brief also tells us that Boyd counterclaimed.

2. We note the implications of this second step of reversible error analysis. Where, as here, appel-

■ Dr. Carr, the physician who treated Reeves upon his admission to the hospital after the collision, was deposed pretrial. During the deposition, Reeves challenged the foundation for the doctor's testimony as to the blood alcohol test result. According to the trial record, the court stated that Dr. Carr's deposition had been "heard in chambers last night without a court reporter present and with both counsel present. And the Court ruled on the objections contained in said deposition...." (R. 384). Before the jury was present the next day, the court discussed with the parties the form of the deposition to be included in the record. When the court asked whether Boyd was "going to introduce the original, ... as part of the official record," Boyd's counsel answered "Yes, sir." (R. 387). Boyd's counsel elaborated that "you want the original in there to preserve [Reeves'] objections." (R. 388). A further colloquy explored Reeves' objection to admission of some of the content of Dr. Carr's deposition:

> THE COURT: Any other preliminary matters outside the presence that we need to consider?
>
> [BOYD'S COUNSEL]: Not that I know of.
>
> [REEVES' COUNSEL]: Do we have to object on the record now at the time they move their admission?
>
> THE COURT: Technically, yes. I have no objection if you want to make your record now.
>
> [REEVES' COUNSEL]: I don't have any problem with doing it now either as long as the Court of Appeals doesn't have a problem with it.
>
> THE COURT: No, I don't think that presents a problem as to when.
>
> [REEVES' COUNSEL]: We can all agree that we can—
>
> [BOYD'S COUNSEL]: Yeah, I don't have a problem—

> [REEVES' COUNSEL]:—if we all stipulate to it, I think it will probably be all right.
>
> [BOYD'S COUNSEL]: Okay.
>
> THE COURT: All right, that you do object and—
>
> [REEVES' COUNSEL]: We'll just make it right now.
>
> THE COURT: All right.
>
> [REEVES' COUNSEL]: And that is the stipulation, right, Ms. Wehling [Boyd's counsel]?
>
> [BOYD'S COUNSEL]: Pardon me?
>
> [REEVES' COUNSEL]: We're all stipulating we can object now rather than at the time you admit the records?
>
> [BOYD'S COUNSEL]: Yes, I'll stipulate to that.
>
> [REEVES' COUNSEL]: Okay.
>
> THE COURT: Go ahead.

(R. 390–92). Reeves then objected, for the record:

> to the admission of the deposition of Dr. Carr for the reason that an inadequate foundation has been laid for admission of the hearsay information that's included within the deposition, including all exhibits to the deposition. There has been no proper chain of custody for the reliability of the information that's contained in Dr. Carr's testimony or the exhibits. There has been an inadequate foundation laid pursuant to any exception to the hearsay rule, including 803, subpart (6), of the new Indiana Rules of Evidence under the business record exception. Uh, there's been no exception laid for the multiple hearsay that's included within the exhibits to the deposition, and the information—some of the information contained in the deposition, including the blood alcohol content, the BAC, is irrelevant and highly prejudicial in this case.

lant limits his submission for review to a partial transcript, the record before the appellate court may be insufficient to allow for the necessary harmless error review. Accordingly, we could decline to perform the initial analysis as to whether there was an admissibility error when the record provided precludes completion of the second step. Appellant has the burden to pro-

vide the court with a record sufficient for appellate review of the error claimed. Ind.Appellate Rule 7.2; *Stypczynski v. Kaiser Jeep Corp.* (1973), 156 Ind.App. 78, 294 N.E.2d 830. An appellee is not required to supplement the partial transcript submitted by an appellant. However, because Boyd has done so in this instance, we believe the record is sufficient to proceed on the merits.

For those reasons the Plaintiff objects to the admission of Dr. Carr's deposition. (R. 392–93). Boyd argues that Reeves "waived any objection to [the blood alcohol test result in the] records by failing to make a specific objection to this evidence when it was offered at trial." (Boyd's Brief at 3). Boyd, the proponent of Dr. Carr's testimony with its accompanying exhibits, offered for the record the unredacted deposition which contained Reeves' objections in order "to preserve your [Reeves'] objections." (R. 388). Further, Boyd agreed to stipulate that the timing of Reeves' objection be adequate for purpose of appeal. For Boyd to argue in his brief that Reeves had waived the admission of evidence issue is without merit, and we find such argument unfair and proper. We also find Reeves' mention in his courtroom objection to admission of "all exhibits" to be sufficiently specific to preserve the matter.[3]

■ As quoted above, Reeves' claim of error asserts Boyd failed to show the chain of custody of the sample of blood. Reeves argues that a chain of custody foundation has four requirements: 1) integrity of the blood sample; 2) continuous identity of the sample; 3) qualification of the testing analyst; and 4) accuracy of the test. According to Reeves, the "proponent must meet each one of these four foundational requirements." Reeves' Brief at 14. Reeves derives his requirements from two cases.

From Orr v. State (1984), Ind.App., 472 N.E.2d 627, reh'g denied, trans. denied, Reeves finds the need to establish the integrity or purity of the blood sample and the continuing identity of the sample throughout the process. Orr was a criminal prosecution on two counts of operating a motor vehicle while intoxicated resulting in the death of another person. On appeal, Orr argued the failure to identify the individual who transported the blood from the emergency room to the laboratory and that the blood sample tested might have been drawn from another patient. We found a lapse of "at most, fifteen minutes" between the taking of the sample in the emergency room and the receipt of the sample in the chemistry lab allowed the reasonable conclusion that the specimen was not contaminated. Id. at 632. Moreover, the patient's identification on one form without a first name was overcome by other evidence of Orr's identity as the patient. Reeves' third requirement, qualifications of the analyst who performed the blood test, he attributes to Pollard v. State (1982), Ind.App., 439 N.E.2d 177. Like Orr, Pollard was convicted of driving while intoxicated resulting in the death of another person. Pollard discusses the evidence presented concerning the laboratory technician's qualifications, because the technician testified at trial; however, we find therein no statement mandating a certain showing of the qualifications of the technician. For his fourth requirement, the accuracy of the test conducted, Reeves returns to Orr, supra. Orr challenged the method of testing his blood by presenting an expert witness who propounded an alternative analysis. We found that "mere contradiction of a recognized expert's method of conducting a scientifically acceptable test is not fatal to admissibility." Orr, 472 N.E.2d at 633. However, again, we do not find Orr to con-

---

**3.** Within Reeves' claim of error as to the admission of the blood alcohol test result, Reeves also argues that the "extremely prejudicial" testimony of another witness, toxicologist Mark E. Carfagna, Ph.D., was "based solely on" that test result. Reeves' Brief at 5. As noted by Boyd, Reeves failed to object to Carfagna's testimony about the blood alcohol content level. Reeves responds that State v. Monninger (1962), 243 Ind. 174, 182 N.E.2d 426, provides that "[t]o preserve error, it is not necessary to make repeated objections on the same grounds after an objection has been overruled," Reeves' Reply Brief at 10, and his earlier objection sufficed. However, as a result of Reeves' failure to object, Reeves' concerns about Dr. Carfagna's reference to a blood alcohol test result which Reeves believed to have been

admitted without sufficient foundation were not brought to the attention of the trial court. When a party "does not properly bring [his] objection to the trial court's attention so that the trial court may rule on it at the appropriate time, he is deemed to have waived that possible error." Ingram v. State (1989), Ind., 547 N.E.2d 823, 829. Because a party must object to the admission of evidence at the time it is offered, a party who fails to make a timely objection not only waives the right to have the evidence excluded at trial but also the right on appeal to assert the admission of evidence as erroneous. Reed v. Dillon (1991), Ind.App., 566 N.E.2d 585. "In failing to make a timely objection or motion [to strike], the party is, in effect, acquiescing in the admission of the evidence." Id.

tain the per se foundational requirement for which Reeves cites it. Because this is not a criminal prosecution but a civil personal injury claim,[4] we do not find Reeves' argument for a four-pronged foundation requirement persuasive on the facts before us.

Boyd contends the medical records, including the report of the blood alcohol test results, were admissible under the business records exception[5] of Ind.Evidence Rule 803(6), providing that the hearsay rule does not exclude a "record" of one's condition "made at or near the time" where "kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make" such a record. Evid.R. 803(6). The rule also includes the procedure for ascertaining the authenticity of such a record, but in this case, Reeves' counsel stipulated to the authenticity of the hospital records. "Trustworthiness and necessity were the parents" of the business records exception. *Baker v. Wagers* (1984), Ind.App., 472 N.E.2d 218, 220. Thus, to exclude from evidence a business record, the opponent must demonstrate that "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Evid.R. 803(6). Reeves asserts that "[i]n the rush and confusion of a busy emergency room, mistakes can easily be made in the drawing, identifying and transporting of a blood sample." Reeves' Brief at 16. In considering his assertion, we review the exhibits introduced during the course of Dr. Carr's deposition and linked by his testimony.

Exhibit 1 is a standard history and physical report prepared by Dr. Carr as part of his duties in the Methodist trauma room. The report was dictated by him on the day of Reeves' admission, October 24th, and transcribed the next day. He described the report as showing "a history and physical examination, laboratory studies, x-ray studies and then our assessment and plan." *Id.* Dr.

Carr stated that he relied on information provided to him by others, such as medical students in the emergency room and emergency medical personnel, for some of the information contained in the report. Information about a patient's condition and behavior at the scene and on arrival at the emergency room, before the doctor sees him, is "absolutely required" and typically relied upon by trauma physicians. (R. 409). Some information was provided to Dr. Carr by Reeves. Some observations were firsthand, by Dr. Carr. On the first page of the report, Dr. Carr noted Reeves' behavior as "loud and somewhat inappropriate;" he explained that "why his behavior was inappropriate is at the point of initial evaluation subjective." (R. 420).

Exhibit 2 is a Methodist Hospital Emergency Room "trauma flow sheet" dated October 24th for patient Timothy Reeves. Dr. Carr is shown as the trauma resident, and he stated he was present when the document was filled out in the emergency room. He described the record as routine and required in the course of a patient's admission to the hospital's emergency room. The flow sheet shows blood was drawn from Reeves and sent to the lab at 3:00 a.m. According to Dr. Carr., Methodist Hospital has a procedure for triage trauma patients in the emergency room: "a basic set of labs is always ordered for purposes of our evaluation of that patient." (R. 421). Blood tests enable the physician to treat the patient by serving "as a base line." (R. 424). A blood alcohol test is performed:

> because it's very important to know whether or not a person's behavior is related to their intoxication from other substances or if it could be related to a head injury. For example, if a patient comes into the ER and is loud and boisterous and inappropriate and their blood alcohol level is normal, that person more than likely has a head

4.  Reeves also refers us to *Fendley v. Ford* (1984), Ind.App., 458 N.E.2d 1167, for the necessity of a chain of custody to admit a hospital record containing the result of a blood alcohol test. In *Fendley,* the question was whether the trial court erred in not admitting the record. Therefore, our perspective focused on whether the exclusion

could be supported. We do not read *Fendley* as establishing a chain of custody requirement.

5.  The derivation of the exception before the adoption of the Indiana Rules of Evidence is carefully traced in *Baker v. Wagers* (1984), Ind. App., 472 N.E.2d 218.

injury and we are very concerned that he may be even at that very moment bleeding into his brain.

(R. 426). Thus, blood alcohol testing is a diagnostic tool. Blood test results are immediately communicated to the doctor because "we have to know those values right away." (R. 427).

Exhibit 3 is a discharge summary report from the hospital laboratory for patient Timothy Reeves, admitted October 24, 1990. According to Dr. Carr, the information is like that which was conveyed to him reporting the results of the blood tests on the morning of October 24th. He further testified that such test results are necessarily relied upon by a trauma resident in the emergency room and that he did in fact rely upon this test result to treat Reeves. The report shows Reeves' blood was tested at 3:13 a.m. and shows a blood alcohol level of .179. Dr. Carr said the results he received were consistent with Reeves' behavior. Dr. Carr testified that Reeves' "loud and inappropriate behavior ... could [have been] due to a head injury" sustained in the collision. (R. 446). He had seen patients "behave in this [same] manner" because of a head injury, but they then have negative results on an alcohol test. (R. 447). Dr. Carr ordered a CAT scan, which can "substantiate other observed abnormalities," and Reeves' results were "completely normal." (R. 445, 444).

Exhibit 4 is the initial patient care record of the emergency room at Methodist Hospital for patient Reeves, described by Dr. Carr as the record "filled out when a patient first comes into the emergency room by the ER physician." (R. 447). The information is relied upon by trauma surgeons, such as Dr. Carr, who are often "in surgery" when a patient arrives and "therefore, we have to rely on these other doctors to convey the initial information to us when we get there." (R. 448). The ER doctor who prepared the record indicated Reeves had alcohol on his breath. Dr. Carr found that observation to be consistent with the blood alcohol test result.

Finally, Exhibit 5 is described by Dr. Carr as the "sign-off note from the trauma service," reporting Reeve's care and treatment in the trauma department. (R. 455). The information contained would be relied upon for Reeves' subsequent treatment and if any neurological problems developed. The injuries reported in the history and physical report (Exhibit 1) match those described in the sign-off note. Dr. Carr's review of the sign-off note, as well as "[Reeves'] initial behavior, the laboratory tests, the CAT scan of the head and the notations that the patient had no neurological deficits and none developed throughout the hospitalization" led to Dr. Carr's conclusion in the deposition "that the patient was drunk at the time of his admission to Methodist Hospital ER." (R. 466).

Dr. Carr's testimony and his explanation of the medical records do not suggest that the report of the blood alcohol test should be found not to be trustworthy and, thus, inadmissible pursuant to Evid.R. 803(6).

■ In addition, we note that Dr. Carr's initial testimony as to his training and medical experience qualify him as an expert witness. As Judge Miller posits in his discussion of expert witness testimony:

> One seeking treatment from a physician would hardly demand that the physician exclude from consideration radiologists' reports concerning X-rays, records of past hospital admissions and treatment by other physicians, or nurses' reports concerning blood pressure and vital statistics. Indeed, the physician is expected to assimilate and evaluate every available source of information in arriving at a diagnosis or prescription for treatment.

13 Robert Lowell Miller, Jr., *Indiana Practice* § 703.106 at 423 (1995). Thus, Ind.Evidence Rule 703 [6] recognizes "this reality of life" by allowing "an expert witness to base an opinion on information received from others before trial, if the information is of a sort

---

**6.** Evid.R. 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. Experts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field.

that other experts in the field reasonably" rely upon. *Id.* Dr. Carr's conclusion that Reeves was intoxicated took into account a series of indications, not simply the blood alcohol test result. A conclusion that Reeves was intoxicated could be reached by Dr. Carr, as an expert witness, based upon records which are inadmissible so long as other experts in the field would reasonably rely on such records. Evid.R. 703. Hence, Dr. Carr's conclusion that Reeves was intoxicated does not require that a chain of custody have been established for the admission of the blood test result record.

■ Further, as Boyd correctly asserts, the jury heard more evidence of Reeves' intoxication than just the blood alcohol test result. The ambulance paramedic stated Reeves "looked like he was intoxicated to me" and elaborated that Reeves' behavior at the scene was consistent with "being drunk." (R. 892). A Marion County Sheriff's Deputy, who reported to the scene to conduct an accident investigation, testified that Reeves "appeared to be intoxicated." A lay witness may give an opinion of another's intoxication. *Mehidal v. State* (1993), Ind.App., 623 N.E.2d 428. And, the blood alcohol test result was only one of several factors leading to Dr. Carr's conclusion of intoxication. The blood alcohol test result indicating intoxication is cumulative to other evidence of intoxication.

Thus, under the facts and circumstances before us in the present case, error—if any—in the admission of the medical record containing the blood alcohol content test result was harmless. *Indianapolis Street Ry. Co. v. Schmidt*, (1904), 163 Ind. 360, 71 N.E. 201 (Because the jury verdict was sustained by other sufficient evidence, the admission of improper evidence was harmless.); *see also Parker v. State ex rel. Town*, (1846), Ind., 8 Blackf. 292. Consequently, there can be no reversible error. *Jordan, supra.*

2. *Inquiry into Reeves' Previous Conviction*

Reeves next claims reversible error occurred when the trial court permitted Boyd

to inquire into Reeves' previous conviction for driving while under the influence of alcohol. Reeves argues that this questioning led to testimony about his conviction, in contravention of Ind.Evidence Rule 404(b).[7]

■ The inquiries occurred during cross-examination. The scope of cross-examination is "limited to the subject matter of the direct examination and matters affecting the credibility of the witness." Ind.Evidence Rule 611(b). Judge Miller summarizes the scope of cross examination under other state and federal versions of Evid.R. 611(b) as including "all matters reasonably related to the issues put in dispute by the direct examination and all inferences and implications arising from the testimony on direct examination." 13 Robert Lowell Miller, Jr., *Indiana Practice* § 611.201 at 197 (1995). "Cross examination is permissible as to the subject matter covered on direct examination, including any matter which tends to elucidate, modify, explain, contradict, or rebut direct testimony." *Hicks v. State* (1987), Ind., 510 N.E.2d 676, 679. The trial court "is allowed to control the conduct of cross-examination." *Jones v. State* (1986), Ind., 500 N.E.2d 1166, 1170. Only a clear abuse of discretion warrants reversal. *City of Indianapolis v. Swanson* (1983), Ind., 448 N.E.2d 668, 671.

■ Reeves had filed a motion in limine to preclude Boyd's making any reference to his 1987 conviction for driving under the influence of alcohol. The motion was granted. However, during Reeves' case in chief, Reeves called Nancy Kay Reeves, his mother, as a witness on his behalf. Reeves' questioning of Mrs. Reeves included the following queries:

Before the collision and before June of 1990, did you ever see Tim drinking around the house?

Did you ever know him to go out drinking with the guys in the evening?

Did he ever come home in the evening when he was living at home drunk?

7. Evid.R. 404(b) provides:
**Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.....

(R. 296). Mrs. Reeves answered "No" to each. After the answer to the last question, Reeves' counsel commented, "Okay. You raised your eyes a little bit on that." To which Mrs. Reeves responded, "That's a no-no." *Id.*

On cross examination of Mrs. Reeves, Boyd asked, "Were you aware that Tim was convicted of a driving while intoxicated charge ...?" (R. 305). Reeves objected, citing Evid.R. 404, and the court responded that "during the break, the Court's indicated that it was lifting the requirement required by the Motion in Limine and the Order in Limine. I think the issue has been raised by Plaintiff's counsel through this witness." (R. 308). The court overruled the objection and allowed Mrs. Reeves to answer the question. She said she did not know about the conviction.

When Reeves testified in his own behalf, Boyd asked him whether he had a prior conviction for "operating under the influence." (R. 360). Again Reeves objected, citing Evid.R. 404, and the court overruled the objection. Reeves admitted the conviction.

Boyd argues that Reeves "opened the door" to inquiry regarding the prior conviction by not only the direct examination questions of Reeves' mother cited above but also Reeves' questioning on direct examination of a former, occasional employer of Reeves. The former employer was asked whether he ever saw Reeves "drinking on the job," or ever heard Reeves "talking about going out in the evening with the other workers, with the guys, to go drinking." (R. 882). The employer answered both questions negatively.[8]

Evid.R. 611(b) allows Boyd to inquire about a previous conviction for driving under the influence because the testimony of the former employer and Reeves' mother gave rise to the inference that Reeves did not partake of alcoholic beverages and, therefore,

would not have been intoxicated at the time of the collision. The inquiry sought to "contradict or rebut," *Hicks, supra,* the implication of Reeves' abstention. Further, if a subject is "touched upon in direct examination" in a manner leaving the "trier of fact with a false or misleading impression of the facts related, the direct examiner may be held to have 'opened the door' to the cross examiner to explore the subject fully, even if the matters so brought out on cross examination otherwise would have been inadmissible." 13 *Indiana Practice* § 611.204 at 201. Because the employer's and Mrs. Reeves' testimony could leave the jury with the false impression that Reeves would not drive while intoxicated, that testimony by Reeves' witnesses on direct examination "opened the door" to an inquiry leading to evidence that Reeves had in fact driven while under the influence of alcohol.

The trial court did not abuse its discretion in allowing the inquiry.

### 3. *Instruction*

■ Reeves claims the trial court committed reversible error when it refused his tendered instruction number 8:

#### *Duty Lookout–Extraordinary Hazards*

The mere fact a collision has occurred does not mean Timothy Reeves was at fault in any manner. I instruct you that no motorist is required to anticipate extraordinary road hazards nor to constantly expect or search for unusual dangers. Motorists have the right to assume that other motorists will exercise reasonable care and no motorist is required to be constantly prepared for every conceivable circumstance or to insure against every collision, particularly where the dangerous condition was created by the fault of the Defendant. A motorist like Timothy Reeves had the right to assume that any

---

**8.** We note that the testimony of this witness was not provided in the record submitted by Reeves. The testimony is included in a supplementary record compiled by Boyd. According to Boyd, the employer testified before Mrs. Reeves did and was the first witness to be questioned about Reeves' drinking. The two partial transcripts we have do not allow us to determine the order in which witnesses testified, as only the date of each witness' testimony is reported. We caution appellants that omitting the testimony of select witnesses might foster the perception that the record presented is a mischaracterization of what took place at trial.

vehicle approaching from the opposite direction would use reasonable care and yield the right-of-way to preferential traffic and that such other vehicle would not block the roadway or violate a law or rule of the road. Therefore, if you find that Timothy Reeves was operating his vehicle with reasonable care at the time of the collision, he had a right to assume that the Defendant would obey all traffic laws and would exercise reasonable care at all times while on a public highway and Timothy Reeves cannot be found negligent for relying upon that assumption.

We summarized the standard applied on appellate review to a claim of trial court error for not having given a tendered instruction in *Underly v. Advance Mach. Co.* (1993), Ind.App., 605 N.E.2d 1186, *reh'g denied, trans. denied.*

A party is normally entitled to have a tendered instruction read to the jury, and we will reverse the trial court for failure to give a tendered instruction if: (1) the instruction is a correct statement of law; (2) it is supported by the evidence; (3) it does not repeat material adequately covered by other instructions; and (4) the substantial rights of the tendering party would be prejudiced by the failure to give the instruction. However, a party is not entitled to a repetitive instruction, or one that does not correctly state the law. We will not reverse the trial court for failing to give the best possible instructions; we will affirm as long as the trial court gave instructions which adequately and correctly stated the law.

*Id.* at 1191 (citation omitted).

Reeves argues that his instruction is a correct statement of the law, that evidence warrants the instruction, that the "substance" of his instruction was not covered by the court's instructions to the jury, and that this instruction "would have enabled the jury to find [Boyd] negligent." Reeves' Brief at 25. Presumably, the last matter leads to Reeves' conclusion that his rights were substantially affected.

We note Boyd's arguments that the instruction is neither a correct statement of the law nor warranted by the evidence. However, we focus our attention on the third and fourth considerations. The court provided the jury with a comprehensive instruction on comparative fault. Additionally, instructions provided by the court, which cover what Boyd describes as "every conceivable theory of negligence" attributable to Boyd, Boyd's Brief at 39, included:

—the standard of care owed by Boyd to Reeves;

—general instructions regarding negligence;

—that if the jury found Boyd had failed to provide its driver sufficient training in maneuvering the tractor-trailer or failed to provide its driver sufficient training and equipment as to safety and the use of warning devices, they could consider that as evidence of negligence;

—that Boyd had a legal duty to exercise reasonable care to give adequate warning to Reeves of the dangerous and hazardous condition created by their flatbed trailer, and the jury could consider failure to do so as evidence of negligence;

—that a statute provided "no person shall recklessly, knowingly or intentionally obstruct vehicular traffic," and the jury could consider violation of this statute without legal justification or excuse as evidence of negligence.

(R. 116). We believe the court's instructions covered the points which Reeves sought to convey in his tendered instruction.

As to the fourth consideration, Boyd contends, and we agree, that the proposed instruction focuses solely on factors which the jury could consider in determining whether Reeves was negligent; it "does not instruct the jury on any duty Boyd [ ] may have owed Reeves" and "does not provide any guidance in determining whether Boyd [ ] was negligent." Boyd's Brief at 39–40. Because the instruction Reeves tendered does not provide any basis upon which fault could be assigned to Boyd and other instructions do, failure to give the instruction cannot be found to have substantially affected Reeves' rights so as to require reversal.

### 4. Deposing Alan McDonald

The trial court has "broad discretion in ruling on issues of discovery and we will interfere only where an abuse of discretion is apparent." *Lucas v. Dorsey Corp.* (1993), Ind.App., 609 N.E.2d 1191, 1195, *trans. denied.*

A witness list filed by Boyd included Allan T. McDonald, Ph.D. Reeves served a notice of deposition and subpoena duces tecum for McDonald.[9] Boyd amended its witness list, eliminating several of the names earlier listed as witnesses, including McDonald, and moved to quash the notice of deposition and subpoena. The court granted the motion and issued a protective order.[10] Reeves claims that he "had the right to depose Alan McDonald as he was listed on" the witness list, and the trial court "abused its discretion when it refused to permit [Reeves] to depose Alan McDonald, despite the clear language of T.R. 26(B)(4)." Reeves' Brief at 27–28. Reeves directs us to the language of Ind.Trial Rule 26(B)(4), which states:

**Trial Preparation: Experts.** Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (B)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained as follows:

(a)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

(ii) Upon motion, the court may order further discovery by other means, subject to such restrictions as to scope and such provisions, pursuant to subdivision (B)(4)(c) of this rule, concerning fees and expenses as the court may deem appropriate.

Reeves claims that when Boyd withdrew their expert before trial, they denied Reeves his right to depose him. Reeves cites no authority other than the above-quoted section of T.R. 26.

As Boyd correctly responds, the next provision of the rule provides a mechanism for the situation which occurred:

A party may discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, only as provided in Rule 35(B) or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

T.R. 26(B)(4)(b). Ind.Trial Rule 35(B) deals with the report of a physician who has conducted an independent medical examination and is inapplicable here. Therefore, according to T.R. 26(B)(4)(b), Reeves had to make a showing as to the exceptional circumstances warranting his access to information from McDonald.

As the parties have referred us to no Indiana cases directly on point, we consult practice under the parallel provision of the federal rules, Fed.R.Civ.P. 26(b)(4)(B), adopted in 1970, wherein:

facts known or opinions held by an expert specially retained by a party in anticipation of litigation or preparation for trial, but not expected to be called as a witness, may be discovered only as provided in Rule 35(b), or on a "showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means."

4 Moore's Federal Practice ¶ 26.17[3]. The Tenth Circuit traced the development of this

---

9. According to Reeves' brief, McDonald was requested to "produce his entire file regarding this matter" The record does not contain the notice of deposition or subpoena.

10. At oral argument before this court on June 28, 1995, counsel for Reeves asserted "strenuous arguments" had been made to the trial court with respect to the motion to quash and the protective order. However, Reeves provided us with no record in this regard.

rule by referring to the advisory committee notes, indicating:

> the structure of Rule 26 was largely developed around the doctrine of unfairness—designed to prevent a party from building his own case by means of his opponent's financial resources, superior diligence and more aggressive preparation.

*Ager v. Jane C. Stormont Hospital & Training, Etc.* (10th Cir.1980), 622 F.2d 496, 502. *Brown v. Ringstad* (S.D.Iowa 1992), 142 F.R.D. 461, cited the Tenth Circuit's use of this historical grounding and further found that:

> the advisory committee notes accompanying the 1970 amendments made clear [that] the drafters of that subparagraph wanted it to reinforce each litigant's motivation to aggressively develop his own side of any given case by retaining and relying on his own expert. The flip side of that objective was to discourage lazy or unscrupulous lawyers from trying to cut case-preparation corners by leaching basic information or valuable opinions from experts retained by their opponents.

*Id.* at 465. Therefore, *Brown* held that a plaintiff was not entitled to depose the defendant's expert medical witness who conducted a T.R. 35 physical exam on the plaintiff since the defendant had decided not to call the expert as a witness and no exceptional circumstances had been asserted.

In *Ross v. Burlington Northern R.R. Co.* (N.D.Ill.1991), 136 F.R.D. 638, a witness originally designated by the plaintiff as a testifying expert witness was later labelled a consulting expert witness. The defendant claimed "it should be permitted to take the deposition of this witness because he was once named as a testifying expert witness." *Id.* The court disagreed.

> Although plaintiff may have originally designed the witness as a testifying expert, plaintiff has the prerogative of changing his mind. Since plaintiff changed his mind before any expert testimony was given in this case, the witness never actually acted as a testifying expert witness. The court cannot find, then, that the shift in designation affects the witness's current status as

a non-testifying expert witness and denies him the protection afforded such a witness.

*Id.* at 639. Thus, because the individual in question was "a nontestifying expert, facts or opinions held by him may only be discovered if defendant shows exceptional circumstances." *Id.*

We presume that our supreme court was familiar with the rationale underlying the drafting of the federal rule which governs discovery directed toward expert witnesses when adopting our very similar T.R. 26(B)(4) and, in so doing, distinguishing between discovery as to a testifying expert and a nontestifying expert. In the case of an expert "who is not expected to be called as a witness at trial," a "showing of exceptional circumstances" is required in order to go forward with discovery. T.R. 26(B)(4)(b). The record before us discloses no such showing by Reeves. The trial court did not abuse its discretion in granting the motion to quash and protective order.

We affirm.

BAKER, J., concurs.

RILEY, J., dissents in part and concurs in part with separate opinion.

RILEY, Judge, dissenting in part and concurring in part.

I respectfully dissent as to Issue I and concur on Issues II, III and IV.

It is my opinion that the admission of Reeves' blood alcohol test was not admissible under the business records exception of Ind.Evidence Rule 803(6) and the admission was reversible error. The hearsay exception for business records is based on a presumption that people preparing reports in the course of their employment will do so with accuracy and honesty. Evaluative reports, however, are of particular concern because they contain opinions and conclusions which may strongly influence a jury. Evid.R. 803(6) provides a valuable safeguard to the admission of business records in the form of evaluative reports. The Rule provides that the following are not excluded by the hearsay rule:

... opinions or diagnoses made at or near the time by, or from information transmitted by, a person with knowledge if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the ... report ..., *unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.* (emphasis added).

To merit judicial reliance on the contents of records, it is necessary that the proponent of particular records establish the trustworthiness of those records. *United States v. Rich*, 580 F.2d 929, 938 (9th Cir.1978), *cert. denied*, 439 U.S. 935, 99 S.Ct. 330, 58 L.Ed.2d 331 (1978). Dr. Carr, by admitting the blood test results, is offering the results to prove the truth of the assertion that Reeves was driving with a blood alcohol level of .179. Offering the blood test results, for that purpose, creates the need to cross-examine the declarant about the test and if that test is trustworthy. In this case, Dr. Carr did not perform the test, was not familiar with the testing protocol, could not testify as to the training and experience of the analyst, was not able to testify if that blood tested was the blood of Reeves, was not able to verify the accuracy of the equipment used to test the blood, or even if standard operating procedures were followed. *Cobb v. State* (1992), Ind.App., 585 N.E.2d 40, 43 (The key requirement is that the witness through which a business record is to be admitted must have personal knowledge of the various elements of the foundation).

The mere fact that Reeves' medical records qualify as an exception to the hearsay rule, does not mean that everything contained in those records is then admissible. The blood alcohol test contains "double hearsay" and a second exception to the hearsay rule must be established for each hearsay statement. Statements of third persons are only admissible when contained in a business record where they satisfy the multiple hearsay requirements of Rule 805. Under Rule 805, the third party statement must have an independent basis of admissibility pursuant to "an exception to the hearsay rule provided in these rules" as identified in Rule 802. In

*Burp v. State* (1993), Ind.App., 612 N.E.2d 169, this Court reaffirmed the need for more than simply a business records foundation to permit the admission of a blood alcohol test.

It is true that the blood alcohol test result was one of several factors leading Dr. Carr to the conclusion that Reeves was intoxicated. I agree that Dr. Carr, in his testimony as an expert witness, could rely on the blood test results in his conclusion that Reeves was intoxicated, however, this does not mean that the test result itself is admissible into evidence. This conclusion only leads us to the second layer of hearsay and a second exception to the hearsay rule must be established to admit the results themselves. Dr. Carr's testimony alone is inadequate to establish that the sample was taken in a medically accepted manner. *Burp v. State*, 612 N.E.2d at 173.

Rule 805 does not limit admissibility to double, i.e., two level, hearsay. However, each level of the out of court statements must satisfy an exception to the hearsay rule. It stands to reason that with each layer of multiple hearsay the accuracy of the statements are diminished. In this context, Rule 403 may operate to authorize the court to exclude multiple hearsay where the court determines the reliability of the evidence has been diminished to an unacceptable extent. Rule 403 provides that the trial judge may exclude evidence:

... if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

Accordingly, if the evidence arouses the jury's sense of outrage or appeals to an instinct to punish, the evidence may be unfairly prejudicial under Rule 403. *Stone v. State* (1989), Ind.App., 536 N.E.2d 534 (trial court has the discretion to exclude relevant evidence that is cumulative where the potential prejudice outweighs the probative value).

Rule 803(6) merely provides that documents described in the rule, which may include opinions, are not excluded by the hearsay rule. Nothing in Rule 803 says that opinions may not be excluded by some other

rule. In fact, Rule 705. Disclosure of Facts or Data Underlying Expert Opinion provides that:

> (t)he expert may testify in terms of opinion or inference and given reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

The fact that a report is generally admissible does not require that everything contained in that report be admitted into evidence. A business record often contain multiple levels of hearsay. Thus, a blood alcohol test result of what a lab technician found could be competent evidence on which to form an opinion of intoxication or the course of treatment of the patient. However, the results themselves should only be admitted by a person qualified as an expert witness under Evid.R. 702 and 705.

In other words, unless Rule 803(6) is deemed to override the opinion rules, it should not be construed to allow the introduction of expert opinions without an opportunity to ascertain the "trustworthiness" of the test. Without such opportunity to cross-examine, anyone who works in a hospital could report the blood alcohol test results upon a mere showing that she worked for the hospital and the report was made in the regular course of business.

It is my conclusion that opinions referred to in Rule 803(6) are those which are incident to or part of factual reports of contemporaneous events or transactions. Business reports which are prepared to state or support expert opinions are not admissible without the preparer being present in court to testify as to her qualifications as an expert and to be cross-examined on the substance, pursuant to Rules 702 and 705.

The majority holds that the blood alcohol test indicating intoxication was cumulative to other evidence of intoxication. I take exception to the broad statement that the blood alcohol test indicates intoxication "only". In today's atmosphere of "zero tolerance" to "drinking and driving" the mere mention of blood alcohol test results may become a conclusion of fact to the jury. The jury may

adopt without examination the opinion in the report without assessing the facts themselves. The report will then have usurped the function of the fact finder. The test result was hearsay and does not qualify as an exception to the hearsay rule as a business record. The trial court erred by admitting the test and under Rule 403 its prejudicial impact far outweighed its probative value.